IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **AMANDA HILL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No.** 14-cv-1021-CJP[1] |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social** ) | |
| **Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Amanda Hill is before the Court, represented by counsel, seeking judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on July 1 2010 and for SSI on December 17, 2010. In both applications, she alleged disability beginning on July 20, 2008. (Tr. 19). Administrative Law Judge (ALJ) Amy Klingemann held the first evidentiary hearing on August 7, 2012. After the hearing, interrogatories were submitted to a physician specializing in rheumatology and internal medicine. Plaintiff requested a supplemental hearing to address this physician's opinion.

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

After holding the second hearing, ALJ Klingemann denied the application in a decision dated June 5, 2013. (Tr. 19-39). Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ erred in her consideration of Dr. Litvin's opinion by failing to recontact the doctor and failing to properly consider the appropriate factors.

### Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue,* 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520;** *Simila v. Astrue,* **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v.*

***Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984). See also, ***Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See**, *Books v. Chater***, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater***, 55 F.3d 300, 306 (7th Cir. 1995)**)**.

The Supreme Court has defined substantial evidence as "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Klingemann followed the five-step analytical framework described above. She determined plaintiff had not been engaged in substantial gainful activity since the date of her application. (Tr. 21). She found plaintiff had severe impairments of morbid obesity, decreased hearing, status post gamma knife surgery[3], acromegaly[4], depressive disorder, and anxiety disorder. The ALJ determined these impairments do not meet or equal a listed impairment. (Tr. 22).

The ALJ found plaintiff had the residual functional capacity to perform work at the medium level, with physical and mental limitations. (Tr. 23). Based on the testimony of a vocational expert, the ALJ found that plaintiff was not

---

[3] "The gamma knife is an advanced radiation treatment for adults and children with small to medium brain tumors" http://www.ucsfhealth.org/treatments/gamma_knife/

[4] "Acromegaly is a hormonal disorder that develops when your pituitary gland produces too much growth hormone during adulthood. When this happens, your bones increase in size, including those of your hands, feet, and face." http://www.mayoclinic.org/diseases-conditions/acromegaly/basics/definition/con-20019216

able to do her past work. However, she was not disabled because she could perform other work that exists in significant numbers in the regional and national economies. (Tr. 37-39).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1. Agency Forms

Plaintiff was born on June 6, 1980 and was twenty-eight years old on her alleged onset date. She was insured for DIB through September 30, 2012. (Tr. 219). She was five feet seven inches tall and weighed two hundred and forty pounds. (Tr. 224). She completed high school and specialized training to become a nurse assistant and physical therapy aide. She previously worked as a cashier in a grocery store and restaurant, bartender, cook, physical therapy aide, certified nurse assistant, and bank teller. (Tr. 225, 251).

Plaintiff claimed her acromegaly, pituitary adenoma[5], depression, bipolar disorder, headaches, joint pain, muscle weakness, fatigue, high blood pressure, and sleep apnea limited her ability to work. (Tr. 224). She took Ambien for insomnia, Buspar for anxiety, Celexa for depression, Depakote for bipolar disorder, Meclizine for vertigo and dizziness, Metoprolol for high blood pressure, Ranitidine for heartburn, and Sandostatin for acromegaly. (Tr. 227).

---

[5] "Pituitary adenomas are common benign tumors of the pituitary gland."
http://www.hopkinsmedicine.org/neurology_neurosurgery/centers_clinics/pituitary_center/pituitary-tumor/types/pituitary-adenoma.html

In January 2011, plaintiff completed a function report. (Tr. 240-50). Plaintiff stated that headaches, vertigo, and sleep apnea affected her concentration and balance. She had difficulty standing for long periods of time and was unable to reach, grasp, lift, and carry items due to joint pain and limited physical abilities. Additionally, she had low self-esteem and frequent mood swings as a result of hormonal imbalances. (Tr. 240).

On a daily basis, plaintiff showered, made sure her daughter was ready for school, ate breakfast, watched television, took naps, occasionally cooked dinner, helped her daughter with her homework and supervised her bathing. Her family helped care for and watch her children. (Tr. 241). Plaintiff was able to make sandwiches, microwavable items, and meals that took less than thirty minutes to prepare. She did the laundry twice a week and cleaned the dishes three to four times a week. (Tr. 242). She did not have a driver's license or vehicle and her parents usually purchased her groceries. (Tr. 243). She was able to handle her finances and enjoyed reading, watching television, and using her computer. (Tr. 244).

Plaintiff claimed she had difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, and following instructions. (Tr. 245). She could typically pay attention for thirty minutes at a time and had no problems with authority figures. (Tr. 245-46). Stress caused her headaches to worsen and she could only handle changes in routine when she had advanced warning. (Tr. 246). The only medication plaintiff claimed to have side effects from was her

Sandostatin injection which caused diarrhea and gastrointestinal problems. (Tr. 247).

### 2. First Evidentiary Hearing

Plaintiff was represented by counsel at both evidentiary hearings. The first hearing took place on August 7, 2012. (Tr. 69-102). At the time of the hearing, plaintiff was thirty-two years old, five feet seven inches tall, and weighed two hundred and twenty-four pounds. (Tr. 75). She testified that her normal weight was around one hundred and ninety pounds but hormonal changes caused her to gain weight. (Tr. 75-76). She did not have a driver's license but stated that the reason she did not have one was unrelated to her disability. (Tr. 76).

Plaintiff graduated high school, completed vocational training, and previously took classes at Southeast Missouri State University and Metro Business College. (Tr. 76).  The vocational training she completed took place in high school and focused on becoming a physical therapy aide and nurse assistant. (Tr. 78). Plaintiff was in the physical therapy assistant program at Southeast Missouri State but dropped out after getting married. She was in the medical assistant program at Metro Business College but became sick and had to quit the program in 2009. (Tr. 77). Plaintiff last worked in 2009 as a cook and cashier. (Tr. 78). She was fired from the cooking job because she frequently missed work and was tardy. (Tr. 79). She also took care of her grandparents' bar and grill for several years until her daughter was born. (Tr. 81-82).

Plaintiff felt she was unable to work due to her joint pain, poor memory and focus, difficulty standing and walking, dropping things frequently, and her need to take a significant amount of breaks. (Tr. 84). She testified that she could sit for thirty minutes at a time and lift twenty to thirty pounds. (Tr. 84-85). She had six different doctors she regularly saw and took Somavert, Topamax, Levothyroxine, Zoloft, Amitriptyline, Ambien, Tramadol, and Prilosec. (Tr. 85-86). She stated that her medications generally helped and did not cause significant side effects. (Tr. 87).

On a regular day plaintiff helped her daughter get ready for school and kept busy by reading or meditating until she returned home. (Tr. 88-89). Plaintiff's daughter was a Girl Scout and plaintiff had been the troop leader for over a year. She spent a significant amount of time planning for meetings and keeping things organized. (Tr. 89-90). She did not have many other hobbies because of her physical limitations. (Tr. 90).

Plaintiff did not think she could perform repetitive tasks with her hands because they went numb. (Tr. 94). She also had difficulty maintaining concentration and focusing. (Tr. 95-96). Plaintiff stated that she was at her worst before she had her tumor removed two years prior to the hearing. Since then, plaintiff felt her condition had somewhat improved. (Tr. 91-92). She was an alcoholic but had abstained from alcohol since February of 2010. (Tr. 96).

A vocational expert (VE) was on hand to testify but the ALJ determined that additional medical evidence was necessary to determine plaintiff's RFC. As a result, the ALJ requested additional evidence in the form of interrogatories

from an independent medical expert and an additional evidentiary hearing after the interrogatories were returned. (Tr. 101).

### 3.  Medical Interrogatory Evidence

After the first hearing, interrogatories were sent to rheumatologist Dr. Anne E. Winkler. After evaluating plaintiff's records, Dr. Winkler opined that none of plaintiff's impairments met or equaled any impairment on the Listing of Impairments. She reasoned that plaintiff's pituitary tumor problems were resolved in 2010 and there was no evidence of organ damage. She completed an RFC assessment and opined that plaintiff could frequently lift and carry up to twenty pounds and occasionally lift and carry fifty pounds. (Tr. 930). Dr. Winkler stated plaintiff could sit, stand, or walk for four hours at a time and up to eight hours a day. (Tr. 931). She could never climb ladders or scaffolds, occasionally climb stairs and ramps, and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 933). Dr. Winkler opined that plaintiff could occasionally tolerate unprotected heights and frequently tolerate moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme heat and cold, and vibrations. (Tr. 934).

### 4.  Second Evidentiary Hearing

Plaintiff was represented by counsel at her second evidentiary hearing on March 6, 2013. Plaintiff's condition primarily remained stable with the addition of a few changes in medication, increased fatigue, and more frequent

10

headaches. She also testified that her tumor had grown and radiation had caused menopause and memory loss. (Tr. 50-54).

A vocational expert (VE) testified. (Tr. 55). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history that was able to perform work at the medium level and could occasionally climb ramps and stairs and never climb ladders or scaffolds. The person could frequently kneel, stoop, balance, crouch, and crawl, and could have occasional exposure to unprotected heights and frequent exposure to moving mechanical parts. Additionally, the person could frequently operate a motor vehicle but would be limited to performing simple repetitive tasks with occasional interaction with supervisors, coworkers, and the public. (Tr. 56-57).

The VE testified that the person could not perform any of plaintiff's previous work. However, she could do jobs that exist in significant numbers in the national economy. Examples of such jobs are bench assembler and laundry worker. (Tr. 57). The VE also stated that all work would be precluded if the person needed a ten minute break every hour. (Tr. 65).

### 5. Medical Evidence

While plaintiff has extensive medical records, her arguments are entirely focused on her treatment history with Dr. Marina Litvin. As a result, this Court will only discuss the records pertinent to plaintiff's claims.

Plaintiff was first seen by Dr. Marina Litvin in October 2011. (Tr. 819-22). Plaintiff's past medical history included growth-hormone secreting

macroadenoma and acromegaly, status post sublabial trans-septal resection[6], with persistently elevated insulin-like growth factor levels, obstructive sleep apnea, hypertension, and bipolar disorder. Plaintiff's macroadenoma was discovered in 2010 while she was being evaluated for headaches. She had the tumor removed in September 2011 and had four to six weeks of relief from headaches and fifteen pounds weight loss shortly thereafter. (Tr. 819). However, her headaches were returning on a daily basis and she had begun treatment at a headache clinic. (Tr. 820).

Dr. Litvin's initial impressions were acromegaly (clinical and biochemical), headaches, irregular menses, tobacco dependence, obstructive sleep apnea, and chest pain. Dr. Litvin ordered plaintiff to get an MRI and additional blood tests. She also increased plaintiff's dosage of Somavert. (Tr. 822). The MRI indicated plaintiff still had a pituitary microadenoma and blood tests indicated her human growth hormone levels were still high. (Tr. 815-16).

Plaintiff saw Dr. Litvin again in November and December 2011. (Tr. 786-98). Plaintiff's headaches improved significantly, her human growth hormone levels were closer to normal range, and her chest pain was resolved. (Tr. 786-93). Dr. Litvin's notes indicated plaintiff was referred for evaluation for a "gamma knife" procedure by a neurologist. (Tr. 788).

Plaintiff saw Dr. Litvin four times in 2012. In January, plaintiff had completed the gamma knife procedure and she felt her headaches had

---

[6] A sublabial trans-septal resection is the standard surgical approach for removing tumors from the pituitary gland.  http://www.mayoclinic.org/documents/endocliniclupdtdec1004final-pdf/doc-20079499

worsened, she was more forgetful, and she was fatigued. (Tr. 771). Dr. Litvin changed plaintiff's medication dosages and told her to return in six weeks. (Tr. 774). In April plaintiff stated her memory was still poor and her headaches were worsening. (Tr. 757). Dr. Litvin referred plaintiff to a neurology clinic. (Tr. 759). When plaintiff returned to Dr. Litvin's office in June she noted that plaintiff was unable to go to the neurology clinic due to a long wait list. (Tr. 747). Plaintiff's headaches had continued and she reported having terrible heartburn, but she started a diet and was exercising to alleviate some of her pain. (Tr. 745).

Plaintiff saw Dr. Litvin in August 2012 and reported continued headaches and memory difficulties. A neurological workup was pending and Dr. Litvin noted plaintiff was applying for disability due to her headaches. (Tr. 944). In January 2013, plaintiff had her last documented visit with Dr. Litvin. Plaintiff had lost weight as a result of watching her diet and exercising. She still experienced frequent headaches and fatigue. Dr. Litvin stated her headaches may have been "rebound headaches." (Tr. 936). An MRI completed in the previous year revealed a very slight increase in plaintiff's pituitary mass and a stable pineal cyst. (Tr. 939). Dr. Litvin changed the dosage on two of plaintiff's medications and was planning to discuss plaintiff's pituitary mass with her neurologists. (Tr. 940).

### 6. Opinion of Dr. Litvin

Dr. Litvin completed a medical source statement for plaintiff in July 2012. (Tr. 662-65). She stated that plaintiff felt she was limited in balancing,

13

even when walking on level terrain, because of her depth perception but the "neuro-optho" testing was pending. (Tr. 662). She opined that plaintiff could sit or stand for sixty to ninety minutes at a time without a break and walk for fifteen to thirty minutes without a break. (Tr. 662-65). Dr. Litvin stated plaintiff could frequently lift two to five pounds and occasionally ten pounds, but nothing heavier. Plaintiff could rarely stoop, crouch, reach above her head, crawl, or climb ladders or scaffolds. (Tr. 663). She could also rarely tolerate exposure to odors or dust, noise, vibration, and temperature or humidity extremes. (Tr. 663-64).

Dr. Litvin indicated plaintiff had significant bilateral manipulative limitations in her ability to handle large objects, perform fine fingering of small objects, and in her grip strength. Dr. Litvin added that she was able to perform these tasks but not repeatedly and when she performed the tasks she would have joint pain. Dr. Litvin opined that plaintiff's vision changes and joint pain caused pain throughout the day, the pain was constant, it reduced her range of motion, and was indicated by complaints, irritability, and grimaces. She did not think plaintiff would need to lie down or take a nap during a normal workday. (Tr. 664). She stated plaintiff would like to take a break every hour for rest and would need a break if she had repetitive tasks to alleviate her pain. Finally, she stated that plaintiff's headaches, joint pain, memory loss, and lack of coordination were all in the process of being "worked up" so she was unable to determine the duration of these impairments. (Tr. 665).

### 7. Consultative Examination

In March 2011, plaintiff had a psychological consultative examination with state agency psychologist Dr. Fred Klug. (Tr. 630-34). Plaintiff admitted to having a drinking problem until February 2010. (Tr. 630). She stated that she had shakes, blackouts, and withdrawal symptoms when she stopped drinking. She was admitted for substance abuse treatment twice and had one psychiatric hospitalization in 2008 for bipolar disorder. (Tr. 631).

Plaintiff's attention span was adequate and her concentration was good. Her immediate and long-term memories were intact but her short-term memory was impaired with retrieval deficits. Her fund of knowledge was adequate, abstract thinking was poor, insight was fair, and judgement was good. Dr. Klug opined that plaintiff's thought processes were goal directed and relevant. Her affect was appropriate and consistent with her thought content. Plaintiff's predominant mood was dysphoric. Dr. Klug's diagnostic impressions were alcohol dependence in early remission, generalized anxiety disorder, and depressive disorder. (Tr. 633).

### 8. RFC Assessment

State agency psychologist Howard Tin performed a mental RFC assessment in April 2011. He reviewed plaintiff's records but did not assess plaintiff in person. (Tr. 649-51). Dr. Tin opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions and maintain attention and concentration for extended periods. (Tr. 649). Additionally, she was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them, interact

appropriately with the general public, and set realistic goals or make plans independently of others. (Tr. 649-50).

### Analysis

Plaintiff contends the ALJ erred in giving Dr. Litvin's opinions little weight by failing to re-contact her, lacking specificity, and failing to consider all of the appropriate factors.

A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical evidence and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).** The version of 20 C.F.R. §404.1527(c)(2) in effect at the time of the ALJ's decision states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "while the treating physician's opinion is important, it is not the final word on a claimant's disability." ***Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)**(internal citation omitted). If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be

considered in weighing medical opinions.  See, **20 C.F.R. §404.1527(c)**. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7ᵗʰ Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record. ***Henke v. Astrue,* 498 Fed.Appx. 636, 639 (7ᵗʰ Cir. 2012); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7ᵗʰ Cir. 2007).** If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it. ***Campbell v. Astrue,* 627 F.3d 299, 308 (7ᵗʰ Cir. 2010).** Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." ***Berger v. Astrue,* 516 F.3d 539, 545 (7ᵗʰ Cir. 2008); *Elder v. Astrue,* 529 F.3d 408, 415 (7ᵗʰ Cir. 2008).**

Plaintiff first argues that the ALJ erred in failing to recontact Dr. Litvin to obtain clarification regarding her opinions. Plaintiff quotes portions of the ALJ's opinion where the ALJ used language like "apparently" and "seemed" to indicate the ALJ needed more of an explanation regarding Dr. Litvin's opinions.

Plaintiff states that the ALJ seemed to assume that Dr. Litvin relied completely on plaintiff's statements (which the ALJ found unreliable).

Plaintiff is incorrect on this point. The ALJ appropriately stated that the medical source statement seemed to rely upon plaintiff's subjective complaints because that is exactly what the medical source statement says. Dr. Litvin explicitly stated that some of her determinations were based on plaintiff's opinions regarding her abilities. Additionally, Dr. Litvin stated that plaintiff's headaches, joint pain, memory loss, and lack of coordination were in the process of being worked up. These notations on the medical source statement clearly indicate that Dr. Litvin made at least some of her determinations based upon plaintiff's statements.

Plaintiff also argues that the regulations *require* recontacting the treating physician when an ALJ finds the evidence on record to be inconsistent. 20 C.F.R. 404.1520b(c). While the regulations do state that recontacting a treating physician may be the preferred method of further developing a record, the comments at **77 FR 10651, 10654** also state that,

> "[d]epending on the nature of the inconsistency or insufficiency, there may be other, more appropriate sources from whom we could obtain the information we need." Therefore, adjudicators need more, not less, discretion than our current recontact requirement provides to obtain the needed information from the most appropriate source. . . We will continue to explore ways of improving the medical evidence collection process, but there are many factors, especially cost, which we must consider before we can require any particular method of obtaining medical evidence.

Further, the Seventh Circuit has stated that "[a]n ALJ is required to make a 'reasonable effort' to ensure the claimant's records contains, at a minimum,

enough information to assess the claimant's RFC and to make a disability determination. *See* 20 CFR §§ 416.912(d), 416.927(c)(3); S.S.R. 96-8p" ***Martin v. Astrue,* 345 Fed. Appx. 197, 201 (7th Cir. 2009).** As the Commissioner notes, the ALJ sent interrogatories to an independent medical examiner in order to fully develop the record in this case. This was an adequate way to deal with inconsistencies per the regulations.

Plaintiff also argues that the ALJ erred by not analyzing every factor for a treating physician's opinion, but this is not necessarily error. The Seventh Circuit has held that an ALJ's reasoning can be sufficient even if it only covers two of the factors outlined in 20 C.F.R. § 404.1527(d). ***Henke v. Astrue,* 498 Fed.Appx. 636, 640 (7th Cir. 2012).** However, while the ALJ is only required to minimally articulate her reasons for rejecting evidence, the reasoning has to be sound. ***Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011).** Here, the Court agrees with plaintiff that ALJ Klingemann's analysis is insufficient.

The ALJ provided three primary reasons that Dr. Litvin's opinions were given little weight. First, as discussed above, she appropriately determined that some of the medical source statement was based solely on plaintiff's subjective complaints. Second, she stated that Dr. Litvin's reports "fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled, and the doctor did not specifically address this issue." Finally, she stated that "the course of treatment pursued by the doctor

has not been consistent with what one would expect if the claimant were truly disabled." (Tr. 36).

The ALJ's second two reasons are lacking in substance. As plaintiff notes, Dr. Litvin's clinical and laboratory reports do indicate abnormalities such as a growth-hormone secreting macroadenoma and acromegaly, elevated insulin-like growth factor and human growth hormone levels, obstructive sleep apnea, hypertension, and bipolar disorder. (*Ex.*, Tr. 745, 757, 773-82, 819-22). The ALJ does not mention these diagnosed issues in analyzing Dr. Litvin's opinion. In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with her conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While she is not required to mention every piece of evidence, "[she] must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** ALJ Klingemann's failure to discuss plaintiff's diagnosed medical problems in light of Dr. Litvin's medical source statement is error.

Additionally, Dr. Litvin saw plaintiff numerous times on record, referred her to specialists, had an MRI performed, indicated plaintiff was receiving gamma knife procedures, and changed plaintiff's prescriptions several times. (*Ex.*, Tr. 759, 788, 940). The ALJ did not explain how this course of treatment was lacking or what would be expected of someone who is truly disabled. The ALJ is not a doctor and it is error for her to assume a certain course of treatment is less serious when no suggestions to this idea have been made by medical

professionals. The Seventh Circuit has held that an ALJ is not permitted to "play doctor" and her decision "must be based on testimony and medical evidence in the record, and not on [her] own 'independent medical findings.'" ***Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).** It seems as though that is what ALJ Klingemann did in the case at hand when she stated that the clinical and laboratory findings as well as the course of treatment were not what one would expect if plaintiff were disabled.

The Commissioner references medical records on file to support the ALJ's determination that plaintiff's limitations were not consistent with the record. However, the ALJ did not reference these medical records when she assigned weight to Dr. Litvin's opinion. In advancing reasons not relied upon by the ALJ, the Commissioner violates the *Chenery* doctrine. See, ***SEC v. Chenery Corporation,* 318 U.S. 80 (1943).** "Under the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." ***Kastner v. Astrue,* 697 F.3d 642, 648 (7th Cir. 2012).**

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009).** While the ALJ was not required to give Dr. Litvin's opinions controlling weight, she needed to adequately explain why her opinion was discounted. ALJ Klingemann simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is

required." ***Kastner v. Astrue***, 697 F.3d 642, 646 (7th Cir. 2012)., citing ***Steele v. Barnhart***, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Amanda Hill's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.


**IT IS SO ORDERED.**

**DATE:  December 14, 2015.**


**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**